**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BRIAN EASTER, | : |
| | : Case No. 2:17-cv-00197 |
| Plaintiff, | : |
| | : CHIEF JUDGE ALGENON L. MARBLEY |
| v. | : |
| | : Magistrate Judge Jolson |
| BEACON TRI-STATE STAFFING, INC., | : |
| et al., | : |
| | : |
| Defendants. | : |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Brian Easter initiated this civil action on March 7, 2017, alleging, among other things, that he was terminated from his job in retaliation for taking protected leave under the Family and Medical Leave Act ("FMLA"). Present before the Court is Plaintiff and Defendants' Cross-Motions for Summary Judgment. (Docs. 100, 101, 102.) The Court held a hearing on this matter on September 24, 2019. For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions for Summary Judgment.

### II. BACKGROUND

For three-and-a-half years, Plaintiff Brian Easter worked as a truck driver jointly employed by Defendants Beacon Tri-State Staffing, Inc. ("Beacon") and C*MAC Transportation, LLC ("C*MAC"). (Doc. 112 at 15.) Beacon is a professional employer organization ("PEO") whose business model is to hire the employees of a client, then lease them back to the client, creating a

1

co-employer relationship. (*Id.* at 18-19.) C*MAC is a logistics company, and client of Beacon, that provides transportation and warehousing. (*Id.* at 19.)

In June, July, and August of 2016, Plaintiff had a series of absences from work. Defendants' employee handbook describes the procedures for requesting time off. (*Id.* at 22.) To report an absence, an employee is required to call C*MAC's dispatch office at least two hours prior to the start of a shift. (*Id.*) If the employee requests FMLA leave for a medical reason, then the dispatch office is to report the absence to C*MAC's safety department. (*Id.*) The safety department, in turn, reports the medical reason to Salvatore Manzo, Beacon's Chief Human Resources Officer. (*Id.*) Mr. Manzo is then responsible for determining whether the medical reason is covered under the FMLA, and if so, providing the requisite notices and forms. (*Id.*)

On June 13, 2016, Plaintiff called off from work after contracting an infection that put him in the hospital for three days. (*Id.* at 22-23.) He spoke to a dispatcher named Joel Koons, who noted the call in C*MAC's electronic system. (*Id.* at 23.) On July 22, 2016, Plaintiff again called off from work to help transport his father from the hospital. (*Id.*) His father had just been diagnosed with terminal brain and lung cancer. (*Id.*) Plaintiff spoke with a dispatcher named Kenneth Clerk, who, like before, documented the call in C*MAC's electronic system. (*Id.* at 24.) Finally, on August 16, 2016, Plaintiff called off after having spent the entire evening with his father at the hospital. (*Id.*) A dispatcher named Raymond Switala recorded this call in C*MAC's system. Plaintiff was never informed whether any of his three absences qualified for FMLA leave. At the same time, Plaintiff did not specifically request FMLA leave for these absences. (Doc. 101 at 14-16.)

Following his third absence, Plaintiff contacted Paula Sirvio, an employee in C*MAC's safety department, and asked whether he could take intermittent FMLA leave if he needed time

off in the future to care for his father. (Doc. 112 at 25.) Ms. Sirvio told Plaintiff that she would send over the necessary forms. (*Id.*) Plaintiff then spoke with Stacey Jose, Ms. Sirvio's supervisor at C\*MAC. (*Id.*) According to Plaintiff, Ms. Jose warned him that the company looked down upon FMLA leave and would find a way to fire employees who take such leave. (*Id.*) Ms. Jose, however, has no memory of this conversation. (*Id.*)

On August 17, 2016, Ms. Jose emailed Chris Miller and Sam Wright informing them that Plaintiff was planning to take intermittent FMLA leave. (*Id.*) Miller oversees operations at C\*MAC and Wright is his direct report. (*Id.*) Miller responded to Ms. Jose's email asking, "What are our legal responsibilities? To operate this lane, I need a driver in place consistently." (*Id.* at 26.) Wright replied, "This happened to me at [a prior company] . . . we couldn't do anything. I had to just deal with his schedule." (*Id.* at 26.) To this, Miller wrote, ***"Fuck that. He's getting replaced."*** (*Id.*)

Plaintiff submitted his FMLA leave request forms on August 18, 2016, which Salvatore Manzo approved. (*Id.* at 27.) Plaintiff then requested leave from August 19 through August 26, 2016. (*Id.*) Tragically, Plaintiff's father passed away on August 21, 2016. (*Id.* at 28.) Hence, Plaintiff returned to work on Monday, August 29, 2016. (*Id.* at 28.) Two weeks later -- September 12, 2016 -- Plaintiff found out that he was fired. (*Id.* at 32.)

Immediately following his termination, Paula Sirvio called Plaintiff and told him that he should consider seeing a lawyer, because the circumstances surrounding his firing were suspicious. (Doc. 112-3.) This belief was based on the fact that (1) she, like Plaintiff, had a negative reaction from supervisors at C\*MAC when she took FMLA leave, and (2) she had personally reviewed Plaintiff's termination paperwork and there was no reason listed for his termination. In her experience, C\*MAC always provided reasons for terminating an employee. (*Id.*)

Plaintiff was one of four Columbus-based drivers that Defendants let go from their positions around this time. (Doc. 112 at 32-33.) Each of these drivers were replaced by new drivers. According to C*MAC's Chris Miller, he made these decisions alone and for the purpose of cleaning house:

> [W]e'd exhausted all of our attempts at improving the operation in Columbus, and after those attempts and requests had been ignored, I could no longer accept the failed performance for our customers; and we had to make a very difficult decision, and I did.

(Doc. 100 at 14.) But Miller's testimony on this point is called into question by a written statement that Beacon made to the Ohio Civil Rights Commission, attesting: "After consulting with Beacon Owner Salvatore Manzo, Mr. Koons and Mr. Manzo decided to terminate all four of the Columbus drivers." (Doc. 112-23 at 5.) Miller also suggests that he made these decisions six months prior to letting the drivers go:

> From the time that we identified the problem, communicated the problem, attempted to coach, until the final decision to get new people in place and reassign those folks, it was a six-month period.

(Doc 112-23 at 16.)

After Plaintiff was let go, he filed for unemployment benefits with the Ohio Department of Job and Family Services ("ODJFS"). (Doc. 112 at 37.) Elizabeth Dimkoski, Beacon's accountant who handles unemployment claims, reported that Plaintiff was fired as a result of his absences on June 13, 2016, July 22, 2016, and August 16, 2016. (Doc. 94 at 20.) The ODJFS, however, awarded Plaintiff unemployment benefits after concluding:

> The claimant was discharged by BEACON TRI-STATE STAFFING on 09/09/2016. The employer has not provided evidence to establish that the claimant was excessively absent/tardy. Ohio's legal standard that determines if a discharge is without cause is whether the claimant's acts, omissions, or course of conduct were such that an ordinary person would find the discharge not justifiable. After a review of the facts, this agency finds that the claimant was discharged without just cause under Section 4141.29(D)(2)(a), Ohio Revised Code.

(Doc. 112-30.)

Accordingly, Plaintiff has filed this FMLA action, raising four claims under federal and state law: **(Count One)** FMLA Interference, 29 U.S.C. §§ 2611, et seq.; **(Count Two)** FMLA Retaliation, 29 U.S.C. §§ 2611, et seq.; **(Count Three)** Age Discrimination under Ohio State Law, O.R.C. §§ 4112.02(N), 4112.14, 4112.99; and **(Count Four)** Associational Disability Discrimination under Ohio State Law, O.R.C. §§ 4112.02, 4112.99. Defendants have filed Motions for Summary Judgment on all four counts of the Complaint. Plaintiff has also filed a Motion for Partial Summary Judgment seeking declaratory findings on four issues: (1) that Defendants' defense of failure to mitigate damages fails as a matter of law; (2) that the cancer from which Plaintiff's father suffered was a disability under Ohio Revised Code Chapter 4112; (3) that Defendants were joint employers of Plaintiff covered by the FMLA and Ohio Revised Code Chapter 4112; and (4) that Plaintiff was an eligible employee under the FMLA.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court may grant summary judgment if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving a motion for summary judgment, the court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court must evaluate "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. ANALYSIS

Beacon, C*MAC, and Plaintiff have all moved for summary judgment. The Court will address Defendants' Motions for Summary Judgment first. Following that, the Court will turn to Plaintiff's Motion for Partial Summary Judgment.

### A. FMLA Joint Employer Liability

As an initial matter, Beacon argues that it is absolved from liability on all claims in Plaintiff's Complaint because C*MAC, not Beacon, was responsible for firing Plaintiff. The Court disagrees and finds that Defendants are joint employers for purposes of liability under the FMLA.

Two entities can be viewed as a single employer of an employee if they meet the "joint employment" test discussed in 29 C.F.R. § 825.106. *Russell v. Bronson Heating & Cooling*, 345 F. Supp. 2d 761, 771 (E.D. Mich. 2004). Under the joint employer doctrine, "courts determine whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees." *Id.* (citing *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997)). Factors to consider include, "authority to hire, fire and discipline employees, promulgation of work rules and conditions of employment, issuance of work assignments and instructions, and supervision of employees' day-to-day activities." *Id.* (quoting *EEOC v. Regency Windsor Mgmt. Co.*, 862 F. Supp. 189, 191 (W.D. Mich. 1994)). 29 C.F.R. § 825.106(b)(2) provides further guidance relevant to this case:

> A type of company that is often called a Professional Employer Organization (PEO) contracts with client employers to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies. The determination of whether a PEO is a joint employer [ ] turns on the economic realities of the situation and must be based upon all the facts and circumstances. A PEO does not enter into a joint employment relationship with the employees of its client companies when it merely performs such administrative functions. On the other hand, if in a particular fact situation, a PEO has the right to hire, fire, assign, or direct and control the client's employees, or benefits from the work that the employees perform, such rights may lead to a determination

that the PEO would be a joint employer with the client employer, depending upon all the facts and circumstances.

29 C.F.R. § 825.106(b)(2).

Here, both Beacon and C*MAC exercise significant control over Plaintiff, such as to make them joint employers. According to Michael Rushing -- C*MAC's Director of HR, Safety, and Compliance -- Beacon and C*MAC share authority over hiring decisions. (Dep. Michael Rushing, Doc. 90 at 22).) Similarly, both companies have the authority to terminate, reassign, and discipline employees. (*Id.* at 23.) This is consistent with Beacon's admission to the Ohio Civil Rights Commission that, "[a]fter consulting with Beacon Owner Salvatore Manzo, Mr. Koons and Mr. Manzo decided to terminate all four of the Columbus drivers." (Doc. 112-23 at 5.). In addition, Salvatore Manzo testified that both Beacon and C*MAC can determine an employee's job duties, as well as write, revise, and implement employee policies. (Manzo Dep., Doc. 93 at 18-19.) And most telling, Beacon has acknowledged that it and C*MAC are joint employers. (Doc. 102-14.).

Still, Beacon points to paragraph nine of its Client Service Agreement with C*MAC, which states: "All business decisions are the sole responsibility of C*MAC." (Doc. 93-1 at 25.) From this, Beacon suggests that C*MAC was the only entity with the power to hire, fire, and control Plaintiff at work. The Court takes issue with this position for two reasons. First, the term "business decisions" is not defined in the Agreement. Hence, it is unclear what such decisions would encompass. Second, and more importantly, Michael Rushing and Salvatore Manzo's testimony directly contradicts this argument. Indeed, they testified that Beacon and C*MAC share this authority. *See Russell*, 345 F. Supp. at 776 (finding joint employer liability where both employers provided employee benefits and retained the right to discipline or terminate employees); *see also Grace v. USCAR*, 521 F.3d 655, 667 (6th Cir. 2008) (holding joint employer liability exists where

both companies exercise significant control over employees).[1]  As such, the Court finds that Beacon and C*MAC are joint employers for purposes of liability under the FMLA.

## B.  FMLA Interference Claim

Count One of Plaintiff's Complaint alleges that Defendants interfered with his rights under the FMLA.  Specifically, Plaintiff asserts that he was fired from his job, in part, for three medical-related absences in June, July, and August of 2016 that Defendants failed to properly certify as FMLA-qualifying events.  Hence, Plaintiff contends that he was denied his full benefits under the Act.

FMLA interference occurs when an employer "shortchange[s] [an employee's] leave time, den[ies] reinstatement, or otherwise interfere[s] with [an employee's] substantive FMLA rights." *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 384-85 (6th Cir. 2017).  To establish a claim for interference, Plaintiff must demonstrate: (1) he was an eligible employee as defined under the FMLA; (2) Defendants were employers as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave Defendants notice of his intention to leave; and (5) Defendants denied him FMLA benefits to which he was entitled.[2] *Edgar v. JAC Products, Inc.*, 433 F.3d 501, 507 (6th Cir. 2006).  Employees seeking relief for FMLA interference must also establish that the employer's violation caused them harm.  *Id.* at 508.

---

[1] Beacon attempts to distinguish *Grace*, and presumably *Russell*, on the ground that they did not consider any language from 29 C.F.R. § 825.106(b)(2).  *See* 521 F.3d 655; 345 F. Supp. 2d 761. This, however, does not change the Court's conclusion.  As addressed above, 29 C.F.R. § 825.106(b) provides that a PEO can be held jointly liable for its client's actions under certain factual scenarios, such as when the PEO has the right to hire, fire, assign, or direct and control the client's employees.  *See* 29 C.F.R. § 825.106(b).  The testimony of Michael Rushing and Salvatore Manzo make clear that Beacon has this authority.

[2] Elements One and Two are not in dispute.

8

### 1. Qualification for FMLA Leave

Under the FMLA, an eligible employee is entitled to leave for, among other things, a serious health condition that makes the employee unable to perform their job, or to care for a spouse or parent who has a serious health condition. 29 U.S.C. §§ 2612(a)(1)(C)-(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition" that involves either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The term "inpatient care" includes an overnight stay in a hospital. 29 C.F.R. § 825.114.

Here, Plaintiff's three absences from work in June, July, and August of 2016 all qualify for FMLA leave. In June 2016, Plaintiff was hospitalized for three days, including one work day, after contracting an infection. As a matter of law, an overnight stay in the hospital qualifies as a serious medical condition, and thus, Plaintiff's June 2016 absence meets this threshold. *See Bryant v. Delbar Prods., Inc.*, 18 F. Supp. 2d 799, 802 (M.D. Tenn. 1998) ("The regulations further define inpatient care to mean an overnight stay in a hospital. There is no question that [plaintiff's son] was hospitalized with advanced kidney failure from March 26, 1995 through March 29, 1995. Thus, [plaintiff's son] had a serious health condition on March 27, 1995.") (internal quotations and citations omitted). Similarly, Plaintiff's July and August 2016 absences qualify for FMLA leave because both involved him caring for his father, who was hospitalized overnight to receive treatment for terminal cancer. Alternatively, these two absences would qualify under the FMLA as a serious health condition involving continuing treatment by a health care provider because Plaintiff's father was under continuing supervision for a terminal illness. 29 C.F.R. § 825.115(d) ("A serious health condition involving continuing treatment by a health care provider includes any

one or more of the following: A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a sever stroke, or the terminal stages of a disease."). Accordingly, Plaintiff has satisfied his burden on this element of his interference claim.

### 2. Notice of an FMLA-Qualifying Event

It is well settled that "[t]o invoke the protection of the FMLA, an employee must provide notice, and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014). Importantly, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* Rather, "[a]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA . . . has occurred." *Id.* The employee's burden is not a heavy one. *Id.*

Here, each time Plaintiff called off from work, he spoke with a member of C*MAC's dispatch office and explicitly informed them that he would be absent because of a medical-related issue. Once Plaintiff made these calls, this should have triggered a report to C*MAC's safety department and notice to Salvatore Manzo, Beacon's Chief HR Officer. It would have then been Manzo's responsibility to determine whether Plaintiff's medical-related absences qualified for FMLA leave. *See Tornberg v. Business Interlink Servs., Inc.*, 237 F. Supp. 2d 778, 785 (E.D. Mich. 2002) (holding that once an employee indicates that leave is needed, the obligation shifts to the employer to obtain any additional required information through informal means). Hence, when viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that

he provided sufficient notice of FMLA-qualifying events, and that Defendants failed to respond appropriately.

### 3. Whether Defendants Denied Plaintiff FMLA Rights to which He was Entitled

Once an employee notifies his or her employer of a potential FMLA-qualifying absence, this requires the employer to notify the employee of their eligibility to take FMLA leave and to provide written notice of their rights and responsibilities. 29 C.F.R. §§ 825.300(b)-(c). If the employer has enough information to determine whether leave is being taken for an FMLA-qualifying reason, then the employer must notify the employee whether the time off will be designated and counted as FMLA leave. 29 C.F.R. § 825.300(d). But where an employer does not have sufficient information to make such a determination, the employer is directed to conduct a further inquiry. 29 C.F.R. § 825.301(a); *see Carmen v. Unison Behavioral Health Grp., Inc.*, 295 F. Supp. 2d 809, 814 (N.D. Ohio 2003) (denying Defendants' motion for summary judgment after concluding: "if Defendants did not have enough information to determine whether Plaintiff's leave should have been designated as FMLA leave, they should have inquired further"). An employer's failure to follow these notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300I.

Here, as addressed above, a reasonable juror could conclude that Plaintiff provided Defendants with sufficient notice of FMLA-qualifying leave requests. If so, Defendants' failure to notify him whether his absences were being designated as and counted towards FMLA leave, or to inquire further, could constitute interference with or denial of his FMLA rights.

4. <u>Whether Plaintiff was Prejudiced by Defendants' Alleged Interference with his FMLA Rights</u>

An employee seeking relief on an FMLA interference claim must establish that "the employer's violation caused them harm." *Edgar*, 443 F.3d at 508. Here, one of the purported reasons that Defendants have offered for firing Plaintiff was his excessive absences; and specifically, his absences on June 13, 2016, July 22, 2016, and August 16, 2016. (*See* Doc. 94 at 20; Doc. 112-13.) If those absences should have been certified for FMLA-protected leave, and the jury finds that Plaintiff was fired for those absences, then Defendants' alleged interference would be the proximate cause of Plaintiff's termination. *See Wallace*, 764 F.3d at 590-91 ("The reason [plaintiff] failed to perfect her leave was because she failed to return the medical-certification form, and the reason she failed to return the form . . . was because [defendant] failed to inform her of the consequences of failing to do so as required by 29 C.F.R. § 825.305. Thus, [defendant's] failure to provide notice was the proximate cause of her termination, meaning that its failure to comply with the regulations prejudiced [plaintiff]."). Because this is a question of fact for the jury, the Court **DENIES** Defendants' Motions for Summary Judgment on Count One of the Complaint.

## C. FMLA Retaliation Claim

Count Two of Plaintiff's Complaint alleges he was fired in retaliation for taking protected leave under the FMLA. Defendants raise three arguments in support of their Motions for Summary Judgment: (1) Plaintiff did not suffer an adverse employment action; (2) there is no causal connection between Plaintiff's FMLA leave request and his termination; and (3) there was a legitimate, non-discriminatory reason for firing Plaintiff.

A plaintiff can prove an FMLA retaliation claim by either direct or indirect evidence. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432 (6th Cir. 2014). Each path

is mutually exclusive; "a plaintiff need only prove one or the other, not both." *Id.* With respect to direct evidence, if believed, it "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* The Sixth Circuit has explained:

> [Direct evidence] does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [FMLA leave], but also that the employer acted on that predisposition.

*Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). If a plaintiff presents direct evidence of discrimination, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)).

As an initial matter, C*MAC argues that Plaintiff did not suffer an adverse employment action because he was not fired, but instead, reassigned to Beacon, then ultimately let go because there were no driving positions available in Ohio, the only state in which he was able to work. In doing so, it appears that C*MAC is contending it is not liable beyond the decision to reassign Plaintiff to Beacon. But this ignores the fact that Plaintiff's reassignment amounted to a constructive discharge. *See Policastro v. N.W. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) ("When a reassignment rises to the level of a constructive discharge, however, the reassignment is an adverse employment action. For a transfer or reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a reasonable person. . . . [I]ncreased distance from home to a new position is a factor in determining whether a constructive discharge has occurred.") (internal citations omitted); *see also Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2002) ("Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by salary or work hour changes. And even if a

reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.") (internal quotations and citations omitted). Indeed, C*MAC is still responsible, whether directly or indirectly, for having placed Plaintiff in a position of unemployment. Therefore, the Court finds that Plaintiff suffered an adverse employment action.

In addition, the Court finds that Plaintiff has presented direct evidence of retaliation. The Court needs to look no further than Chris Miller's email where, in response to learning he had to accommodate Plaintiff's FMLA leave request, he wrote: ***"Fuck that. He's getting replaced."*** Defendants attempt to explain this email away as mere frustration and note that the decision to fire Plaintiff was made six months earlier and due to performance issues. Defendants also point to the fact that three other drivers who did not request FMLA leave were also terminated around this time. But even accepting all this as true, a reasonable juror looking at this email, and Plaintiff's termination shortly after, could conclude that his FMLA leave request was at least a motivating factor for his firing. Accordingly, the Court **DENIES** Defendants' Motions for Summary Judgment on Count Two of the Complaint.

### D. Ohio Age Discrimination Claim

Count Three of Plaintiff's Complaint alleges he was terminated on account of his age. Plaintiff, however, is no longer pursuing this claim. Accordingly, the Court **GRANTS** Defendants' Motions for Summary Judgment on Count Three of the Complaint.

### E. Ohio Associational Disability Discrimination Claim

Count Four of Plaintiff's Complaint alleges he was terminated because of his association with his disabled father, in violation of Ohio Revised Code §§ 4112.02. Defendants argue that no

such claim exists under Ohio law. Alternatively, Beacon argues that O.R.C. § 4125.03(E) insulates them from liability. Finally, Defendants argue that Plaintiff's claim fails because his father passed away prior to him being fired, thereby destroying any potential nexus for associational discrimination.

### 1. Ohio Courts Recognize Associational Discrimination Claims

First, Defendants argue that associational disability discrimination does not exist under Ohio law. Federal courts are split on this issue. O.R.C. § 4112.02 provides that it is unlawful for any employer, "because of the race . . . [or] disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to . . . any matter directly or indirectly related to employment." O.R.C. § 4112.02(A). Several courts, including the Sixth Circuit in two unpublished opinions, have found that, on its face, this statute does not extend to associational discrimination claims. *See Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 830-31 (6th Cir. 2002) (finding plaintiff's state associational disability discrimination claim lacked merit because O.R.C. § 4112.02 contained no such prohibition); *Kepreos v. Alcon Labs., Inc.*, 2013 WL 1316366, at *1 (6th Cir. Apr. 3, 2013) (holding the district court correctly determined that Ohio's disability discrimination statute does not provide for a associational claim); *Eddy v. J&D Home Improvement, Inc.*, 2018 WL 2287890, at *2 (S.D. Ohio May 18, 2018) (recognizing the Sixth Circuit has determined that discrimination by association does not exist under O.R.C. § 4112.02); *Sarvak v. DDR Corp.*, 2012 WL 4050020, at *7 (S.D. Ohio Sept. 13, 2012) ("To the extent plaintiff is attempting to assert an 'associational' claim under Ohio law, courts have repeatedly held that no such claim exists in the disability context under Ohio law.") (internal citations omitted); *Sturgeon v. S. Ohio Med. Ctr.*, 2011 WL 5878387, at *12 (S.D. Ohio Nov. 23, 2011) ("There is no associational disability claim under Ohio law."). But other courts, including this Court and Ohio

state courts, have held to the contrary. *See Edizer v. Muskingham Univ.*, 2012 WL 4499030, at *7 (S.D. Ohio Sept. 28, 2012) (Marbley, J.) ("While the Sixth Circuit has said in dicta that Ohio Revised Code § 4112.02 does not recognize a claim for associational discrimination, Ohio court's confronting the issue directly have held to the contrary.") (internal citation omitted); *Ohio Civil Rights Comm'n v. Lysyj*, 38 Ohio St. 2d 217, 220-21 (Ohio Sup. Ct. 1974) (superseded on other grounds) ("[A]ppellee argues that the proscriptions of [O.R.C. 4112.02(G)] extend only to direct discrimination on the basis of race or color, and that the statute has no application to indirect discrimination against a person on the basis of the race or color of his associates. Acceptance of that position, however, would result in an overly restrictive interpretation of R.C. 4112.02(G)."); *Cole v. Seafare Enterprise Ltd., Inc.*, 1996 WL 60970, at *2 (Ohio App. Ct. Feb. 14, 1996) ("[T]he Ohio Supreme Court's interpretation of R.C. 4112.02(G) to include a proscription against discrimination based on association must be applied to R.C. 4112.02(A)."); *Berry v. Frank's Auto Body Carstar, Inc.*, 817 F. Supp. 2d 1037, 1049 (S.D. Ohio 2011) ("Even though *Lysyj* or *Cole* involve claims of associational discrimination based upon race, those cases' holdings would arguably apply to Michael's claim of associational discrimination based upon Brennan's disability."); *Maxwell v. City of Columbus*, 2011 WL 2493525, at *4 (S.D. Ohio June 21, 2011) ("Ohio Revised Code § 4112.02 likewise includes a proscription against discrimination based on association."); *Arnold v. City of Columbus*, 515 F. App'x 524, 529 (6th Cir. 2013) ("Section 4112.02 of the OCRA similarly prohibits discrimination based on association.").

After surveying the cases on both sides of this split, it is apparent that courts deciding not to recognize associational discrimination claims under Ohio law, have done so largely in reliance on dicta in *Smith*, an unpublished Sixth Circuit opinion. *See* 36 F. App'x at 830-31. But *Smith*, itself, did not address, or attempt to distinguish, the Ohio state court cases that have expressly

recognized associational discrimination claims. *See id.* Nevertheless, Defendants suggest that these Ohio state cases can be distinguished on the ground that they pertained to associational discrimination based on *race*, as opposed to *disability*. *See Cole*, 1996 WL 60970, at *2; *Lysyj*, 38 Ohio St. 2d at 220-21. But such a distinction has no basis in rationality; especially considering O.R.C. § 4112.02 expressly encompasses both race and disability discrimination. *See* O.R.C. § 4112.02(A). Therefore, this Court will follow the Ohio state courts in finding "Ohio law does permit a claim of associational discrimination." *Edizer*, 2012 WL 4499030, at 7.

2. Ohio Revised Code § 4125.03(E) does not Shield Beacon from Liability at this Juncture

Next, Beacon argues that O.R.C. § 4125.03(E) insulates them from liability on Plaintiff's associational discrimination claim. O.R.C. § 4125.03(E) provides:

> Unless otherwise agreed to in the professional employer organization agreement, liability for acts, errors, and omissions shall be determined as follows:
>
> (1) A professional employer organization shall not be liable for the acts, errors, and omissions of a client employer or a shared employee when those acts, errors, and omissions occur under the direction and control of the client employer.
>
> (2) A client employer shall not be liable for the acts, errors, and omissions of a professional employer organization or a shared employee when those acts, errors, and omissions occur under the direction and control of the professional employer organization.

O.R.C. § 4125.03(E)(1)-(2). Again, Beacon argues that it played no role in the decision to terminate Plaintiff's employment.

Here, there is a genuine dispute of material fact as to whether Beacon was involved in the decision to fire Plaintiff. Although Chris Miller contends that he made this decision alone, Beacon has acknowledged, in writing, that: "After consulting with Beacon Owner Salvatore Manzo, Mr. Koons and Mr. Manzo decided to terminate all four of the Columbus drivers." (Doc. 112-23 at 5.) This evidence, at the very least, suggests that Beacon may have had some direct involvement in

the decision.  Accordingly, at this juncture, O.R.C. § 4125.03(E) will not insulate Beacon from liability on Plaintiff's associational discrimination claim.

3. Whether Plaintiff was Fired *Because of* His Association with his Disabled Father

Finally, Defendants argue that Plaintiff's associational discrimination claim fails as a matter of law because any nexus between his termination and his association with his disabled father was destroyed when his father passed away.

Ohio courts analyzing disability discrimination claims have looked to the Americans with Disabilities Act for guidance.  *See, e.g.*, *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 573 (Ohio Sup. Ct. 1998).  Under the ADA, the Sixth Circuit recognizes three theories of liability for associational discrimination: "(1) expense; (2) disability by association; and (3) distraction."  *Williams v. Union Underwear Co., Inc.*, 614 F. App'x 249, 254 (6th Cir. 2015).  Here, Plaintiff asserts a claim pursuant to the distraction theory.  This theory pertains to discrimination "based on the employee's being somewhat inattentive at work because of the disability of someone with whom he or she is associated."  *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011).

Importantly, an employer may be liable for associational disability discrimination "where it terminated an employee based on an unfounded assumption regarding the employee's need for future leave in order to care for a disabled person."  *Gonzalez v. Wells Fargo Bank, N.A.*, 2013 WL 5435789, at *7 (S.D. Fla. Sept. 27, 2013) (citing *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209 (4th Cir. 1994)).  But "an employer's decision to terminate an employee with a disabled relative is within legal bounds where it is based on an established record of past absences, or a clear indication of the employee's intent to take additional time off to care for the disabled relative."  *Id.*; *see Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009)

("Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative. The statute clearly refers to adverse employment actions motivated by 'the known disability of an individual' with whom am employee associates, as opposed to actions occasioned by the association."); *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012) ("Associational discrimination claims are unlike those otherwise falling under the ADA because employers are not required to provide reasonable accommodations to non-disabled workers.").

Here, Plaintiff points to no evidence suggesting he was fired *because of* his association with his disabled father. Nor has Plaintiff presented evidence demonstrating he was fired based on an unfounded assumption that he would need time off from work in the future to care for his father. To the contrary, Plaintiff had a clear track record of requesting time off from work to care for his father, having done so on July 22, 2016 and August 16, 2016. Following that, Plaintiff indicated he would be requesting intermittent leave, demonstrating a clear intent to take periodic time off in the future. *See Gonzalez*, 2013 WL 5435789, at *7 ("[A]n employer's decision to terminate an employee with a disabled relative is within legal bounds where it is based on an established record of past absences, or a clear indication of the employee's intent to take additional time off to care for the disabled relative."). Moreover, Plaintiff's father passed away on August 21, 2016, Plaintiff returned to work on August 29, 2016, and he was informed that he was fired on September 12, 2016. It follows that on the date Plaintiff was terminated, Defendants could not have been concerned about him missing work in the future. Accordingly, the Court **GRANTS** Defendants' Motions for Summary Judgment on Count Four of the Complaint.

## F.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff has moved for partial summary judgment, seeking declaratory findings on four issues: (1) that Defendants' defense of failure to mitigate damages fails as a matter of law; (2) that the cancer from which Plaintiff's father suffered was a disability under Ohio Revised Code Chapter 4112; (3) that Defendants were joint employers of Plaintiff covered by the FMLA and Ohio Revised Code Chapter 4112; and (4) that Plaintiff was an eligible employee under the FMLA. Defendants do not contest issues Two and Four.  Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment on issues Two and Four.

### 1.  There is no Evidence that Plaintiff Failed to Mitigate Damages

Defendants' have raised an affirmative defense that Plaintiff failed to mitigate damages following his termination.  Plaintiff, however, contends that after he was fired, he immediately took steps to find new employment.  He thus asserts that this affirmative defense fails as a matter of law.

An employee's mitigation efforts is one of several factors the Court must consider when assessing damages.  *Killian v. Yorozu Automotive Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). The burden of proof lies with Defendants and is satisfied by demonstrating (1) "there were substantially equivalent positions available" and (2) "[P]laintiff did not use reasonable care and diligence in seeking such positions." *Id.* at 557.

Plaintiff attests that he submitted job applications every week after he was terminated. (Doc. 102 at 10.)  Further, that he was able to find new work as a truck driver within two months. (*Id.*)  C*MAC, on the other hand, maintains that a genuine issue of fact remains as to whether Plaintiff used reasonable diligence in seeking substantially equivalent positions.  It points to the deposition testimony of Craig Weber -- another Columbus-based driver -- who claimed that truck

driving positions are a dime a dozen and that, hypothetically speaking, he could find one within three days. (*See* Doc. 96 at 15.)

Here, Defendants have presented no evidence suggesting there were substantially equivalent truck driving positions available to Plaintiff. Mr. Weber's testimony is based on pure speculation, and therefore, does not satisfy Defendants' burden at this stage. *See Taylor v. Invacare Corp.*, 64 F. App'x 516, (6th Cir. 2003) (finding speculative testimony that "unemployment was low and jobs were plentiful" insufficient to establish that plaintiff failed to mitigate damages). Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial Summary on the issue of mitigation.

### 2. Defendants are Joint Employers for Purposes of Liability Under the FMLA

Plaintiff also asks the Court to find that Defendants are joint employers of Plaintiff covered by the FMLA and Ohio Revised Code Chapter 4112. Beacon only challenges Plaintiff's Motion to the extent he seeks a determination that Beacon can be held jointly liable for terminating Plaintiff's employment. The Court, however, has already addressed this issue under Section (A) above. Hence, for the reasons stated therein, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment on the issue of joint employer liability under the FMLA.[3]

### V. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions for Summary Judgment. Counts Three and Four are hereby **DISMISSED**.

---

[3] To the extent Plaintiff's Motion seeks a determination that Defendants are joint employers under O.R.C. Chapter 4112, this request is now Moot, as both state law claims have been Dismissed.

**IT IS SO ORDERED.**

   /s/ Algenon L. Marbley
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: September 27, 2019**